# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

JUNFEI LI, §
§
     Plaintiff, §
VS. § CIVIL ACTION NO. 7:15-CV-00534
§
The University of Texas Rio Grande Valley, §
§
     Defendant. §

## OPINION

The Court now considers The University of Texas Rio Grande Valley's ("UTRGV" and "Defendant") motion for summary judgment.[1] After duly considering the record and relevant authorities, the Court **GRANTS** the motion.

### I. BACKGROUND

#### A. *Factual History*

Dr. Junfei Li ("Plaintiff") earned his bachelors and masters degrees in electrical engineering in China, and his doctorate from the University of Texas at Austin.[2] He worked as an Assistant Professor at the University of Texas Pan-American ("UTPA") beginning in 2002, and applied for tenure in 2007.[3] The College Tenure and Promotion Committee gave a "negative" recommendation, but Plaintiff appealed and received tenure anyway in 2008.[4]

After receiving tenure, Plaintiff's research activity decreased substantially. For example, while working for UTPA from 2002–2007, before receiving tenure, Plaintiff published eighteen various articles and conference proceedings.[5] However, from 2008–2015, after receiving tenure,

---

[1] Dkt. No. 25.
[2] Dkt. No. 25-1 p. 10.
[3] *Id.* pp. 19 & 47.
[4] *Id.*
[5] *Id.* pp. 51–52.

Plaintiff published only one conference proceeding.[6] Even so, Henrich Foltz ("Foltz")—the Chair of UTPA's Electrical Engineering Department—attests that "[c]onference proceedings are not given much weight; tenured professors are expected to publish peer-reviewed journal articles and to obtain research funding grants."[7] Thus, Foltz attests that Plaintiff's "research and productivity dropped tremendously in the period after he received tenure."[8]

Plaintiff underwent post-tenure review in 2014.[9] Under normal circumstances, and "[i]f the dean and the department committee conclude[s] that the faculty member is meeting his or her academic responsibilities, no further action will be taken . . . ."[10] This was not the case for Plaintiff, who instead received a letter from Havidán Rodríguez ("Rodríguez")—UTPA's Provost at the time—indicating that "several important concerns emerged in your review . . . ."[11] These concerns included: significant variation in student evaluation scores; failure to publish *any* peer-reviewed journal articles since 2007, before Plaintiff received tenure; and failure to obtain externally-funded research grants.[12]

More generally, the letter strongly suggested that Plaintiff's post-tenure years were defined by "insufficient professional achievement."[13] Consequently, UTPA required Plaintiff to develop "a research plan," and expected "significant and positive improvements in the area of scholarship . . . ."[14] Failure to do so would prevent Plaintiff from being promoted "to the next rank."[15] The letter concluded by noting that "this review has raised *significant* concerns

---

[6] *Id.* pp. 19 & 51.
[7] *Id.* p. 91.
[8] Dkt. No. 25-1 p. 91.
[9] *Id.* p. 45.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] Dkt. N. 25-1 p. 45.
[15] *Id.*

regarding your professional achievements, which must be addressed through the action plan requested by the Dean."[16]

UTPA was independently abolished by legislative decree—along with Plaintiff's tenured employment—on August 31, 2015,[17] and UTRGV was created. Tenured faculty from UTPA could apply to UTRGV during its "Phase I" hiring cycle, and would often "receive offers" so long as they "met certain criteria," such as no previous disciplinary action.[18] This hiring cycle, although available to UTPA tenured faculty, was not available to the general public.[19] UTRGV extended a tenured employment offer to Plaintiff during the Phase I hiring cycle on October 6, 2014.[20] Plaintiff's starting salary would be $92,971.00, but the offer "will expire at 5:00 p.m. on October 17, 2014."[21] Plaintiff did not timely accept the offer.

Leading up the offer's expiration date, and on October 14, 2014, UTRGV sent a reminder email: "[Y]our offer for a faculty position at UTRGV will expire at **5:00 p.m. on October 17, 2014**."[22] UTRGV sent similar reminder emails on October 15 and 16, 2014.[23] Ultimately, Plaintiff attempted to accept the offer on October 19, 2014—two days after the offer had expired.[24] He admits: "I missed the deadline,"[25] while noting that "[t]his semester has been very busy."[26] Although UTRGV did not accept Plaintiff's untimely response, Plaintiff was invited to apply to UTRGV during its "Phase II" hiring cycle,[27] which was open to the general public.

---

[16] *Id*. (emphasis added).
[17] Dkt. No. 19 p. 37.
[18] Dkt. No. 25-1 p. 91, ¶ 3.
[19] *Id*. The Court infers this proposition from Foltz's attestation that UTRGV's Phase II hiring cycle was open to the general public.
[20] *Id*. p. 84.
[21] *Id*. p. 85.
[22] *Id*. p. 87 (emphasis in original).
[23] *Id*. pp. 88–89.
[24] Dkt. No. 25-1 pp. 81–82.
[25] *Id*. p. 82.
[26] *Id*.
[27] *Id*. pp. 81-82.

Plaintiff thereafter applied for a tenured UTRGV faculty position during its Phase II hiring cycle.[28] UTRGV received twenty-three applications for this particular position, and a search committee (having conducted telephone screenings and interviews) created a "final short list" consisting of two applicants—Plaintiff and Dr. Nantakan Wongkasem ("Wongkasem").[29] The latter earned her masters and doctoral degrees from the University of Massachusetts, Lowell.[30] Her masters grade point average (GPA) was 4.0, while her overall doctoral GPA was 3.97, and her major-specific doctoral GPA was 4.0.[31]

Foltz, who served as the interim chair of UTRGV's Electrical Engineering Department, initially "considered the relative strengths of the two candidates to make a hiring recommendation to [Dean] Miguel Gonzalez."[32] After personally interviewing Wongkasem, and "being satisfied with her teaching approach and experience,"[33] Foltz recommended to Dean Gonzalez that Wongkasem be hired instead of Plaintiff, and Dean Gonzalez agreed with the recommendation.[34]

Wongkasem was hired instead of Plaintiff because, as Foltz notes, "Wongkasem had a far better publication and funding track record in recent years."[35] The evidence supports this conclusion. In its briefing, Defendant provides a graph similar to the following, which is both helpful and supported by the evidence:[36]

---

[28] *Id*. p. 47.
[29] *Id*. p. 70.
[30] Dkt. No. 25-1 p. 56.
[31] *Id*.
[32] *Id*. p. 92, ¶ 5.
[33] *Id*.
[34] *Id*. pp. 68–69 (Foltz's recommendation letter to Dean Gonzalez); *Id*. p. 92, ¶ 6.
[35] Dkt. No. 25-1 p. 92, ¶ 5.
[36] *Compare* Dkt. No. 25-1 pp. 56–65 (Wongkasem's curriculum vitae, publication list, and research interests) *with id*. pp. 49–54 (Plaintiff's curriculum vitae and publications list).

| | Wongkasem | Plaintiff |
|---|---|---|
| *Peer-reviewed journal publications between 2008–2015* | 11 publications | None |
| *Conference proceeding publications between 2008–2015* | 18 publications | 1 publication |
| *Patents* | 8 patents | None |
| *Research funding between 2008–2015* | 8 grants obtained as primary investigator, maintaining funding since 2008 | No grants obtained after 2008 as primary investigator, and prior grants ran out in 2011 |

Because of these differences, Dean Gonzalez believed that Wongkasem had "a higher potential for long[-]term success . . . ."[37]

Dean Gonzalez recommended to Rodríguez in a memorandum dated May 22, 2015 that Wongkasem be hired for the tenured position.[38] Rodríguez adopted the recommendation on June 4, 2015,[39] and Wongkasem was offered the job on July 1, 2015.[40] She accepted the offer on July 2, 2015.[41] Thereafter, UTRGV assembled a research start-up package for Wongkasem that included an "ADVANCE" grant which paid $1,000.00 for conference travel and $10,000.00 for a research assistant.[42] The ADVANCE grant is funded by the National Science Foundation and "designed to attract more females to the science and technology fields."[43]

Notwithstanding this purpose, and according to Foltz: "UTRGV spends the bulk of the money from the ADVANCE grant on workshops, speakers, and leadership development programs that are open to both male[s] and females."[44] Moreover, "[t]he $11,000 from ADVANCE did not directly benefit the Electrical Engineering Department or provide any additional motivation to hire [Wongkasem]. The start-up package was created after the decision

---

[37] Dkt. No. 25-1 p. 67.
[38] *Id.* p. 66.
[39] *Id.* (*See* Rodríguez's signature and the date hand written above the "Approve and Date" column).
[40] *Id.* p. 92, ¶ 6.
[41] *Id.*
[42] *Id.*
[43] Dkt. No. 25-1 p. 92, ¶ 6.
[44] *Id.*

to recommend for hire was already made, and it played no role in the decision to hire [Wongkasem]."[45]

Plaintiff was informed on July 6, 2015 that Wongkasem got the Phase II tenured faculty position, and that he did not.[46] Nevertheless, Plaintiff was offered a non-tenured Senior Lecturer position at UTRGV with a salary of approximately $70,000.00[47]—$22,000.00 less than he would have made had he been hired for the tenured position.[48] In sum, Plaintiff failed to timely accept his Phase I offer, was not selected during Phase II for a tenured position ostensibly due to stiff competition, and ultimately received a lower-pay, non-tenured position at UTRGV, where he teaches to this day.

### B.    *Procedural History*

Plaintiff sued Guy Bailey, Rodríguez, UTPA, The University of Texas System ("UT System"), and UTRGV in state court on August 31, 2015.[49] Plaintiff alleged Fifth and Fourteenth Amendment due process violations,[50] and also requested declaratory relief announcing the same.[51] The case was thereafter removed to federal court, and the defendants filed a Federal Rule of Civil Procedure ("Rule") 12(c) dismissal motion.[52] Plaintiff's response embedded a motion for leave to amend.[53] Plaintiff inexplicably filed another motion for leave to amend,[54] and then yet another motion for leave to amend,[55] all in an attempt to add a Title VII sex discrimination claim,[56] as well as a request for equitable relief.[57]

---

[45] *Id.*
[46] *Id.* p. 92, ¶ 7; *Id.* p. 90 (an email setting up the meeting in which Plaintiff was informed he did not get the job).
[47] Dkt. No. 19 p. 7, ¶ 36.
[48] *See* Dkt. No. 25-1 p. 67 (indicating Wongkasem's salary would be $92,000).
[49] Dkt. No. 1-3 p. 5.
[50] *Id.* p. 10.
[51] *Id.* p. 13.
[52] Dkt. No. 4.
[53] Dkt. No. 5 p. 13.
[54] Dkt. No. 7.
[55] Dkt. No. 11.
[56] *See* Dkt. No. 11-1 p. 14.

The Court issued an opinion denying Plaintiff's motions for leave to amend in all respects except with regard to Plaintiff's proposed Title VII claim—and only as against UTRGV.[58] The Court otherwise granted the defendants' Rule 12(c) dismissal motion with regard to all other pending claims: "All of Plaintiff's claims other than the Title VII claim against UTRGV are hereby **DISMISSED WITH PREJUDICE**."[59] Nevertheless, Plaintiff proceeded to *blatantly ignore* the Court's opinion in its amended complaint by (1) renaming Guy Bailey, Rodríguez, UTPA, and UT System as Defendants, even though all claims against them had been dismissed with prejudice, and (2) repleading his due process claims, as well as his coordinate requests for declaratory and equitable relief.[60]

Defendant filed the instant motion for summary judgment on December 15, 2017, and Plaintiff timely responded,[61] rendering the instant motion ripe for review. The Court now turns to its analysis.

## II. LEGAL STANDARD

Under Rule 56, summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[62] A fact is material "if its resolution could affect the outcome of the action,"[63] while a genuine dispute is present "only if a reasonable jury could return a verdict for the non-movant."[64] As a result, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[65]

---

[57] *See id*. p. 13.
[58] Dkt. No. 18 p. 12.
[59] *Id*. (emphasis in original).
[60] *See* Dkt. No. 19.
[61] Dkt. No. 26.
[62] Fed. R. Civ. P. 56(a).
[63] *Burrell v. Dr. Pepper/Seven UP Bottling Grp.*, Inc., 482 F.3d 408, 411 (5th Cir. 2007) (internal quotation marks and citation omitted).
[64] *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006) (citation omitted).
[65] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the initial burden of showing the absence of a genuine issue of material fact,[66] but is freed from this initial burden on matters for which the non-movant would bear the burden of proof at trial; in that event, the movant's burden is reduced to merely pointing to the absence of evidence.[67] The non-movant must then affirmatively demonstrate the existence of a genuine issue of material fact.[68] This demonstration must specifically indicate facts and their significance,[69] and cannot consist solely of "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation[.]"[70]

In conducting its analysis, the Court may consider evidence from the entire record, viewed in the light most favorable to the non-movant.[71] Rather than combing through the record on its own, however, the Court looks to the motion for summary judgment and response to present the evidence for consideration.[72] Parties may cite to any part of the record, or bring evidence in the motion and response.[73] By either method, parties need not proffer evidence in a form admissible at trial,[74] but must proffer evidence substantively admissible at trial.[75]

### III.   ANALYSIS

As an initial matter, the Court only authorized Plaintiff to include a single Title VII claim against UTRGV in his amended complaint, and all other claims were dismissed with prejudice.[76] Thus, insofar as Plaintiff has pled *anything* beyond a Title VII claim against UTRGV in his

---

[66] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[67] *See id.* at 323–25; *see also Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995).
[68] *See Celotex Corp.*, 477 U.S. at 323.
[69] *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).
[70] *U.S. ex rel. Farmer v. City of Hous.*, 523 F.3d 333, 337 (5th Cir. 2008) (citing *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)).
[71] *See Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) (citations omitted).
[72] *See* Fed. R. Civ. P. 56(e).
[73] *See* Fed. R. Civ. P. 56(c).
[74] *See Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").
[75] *See Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) ("[T]he evidence proffered by the plaintiff to satisfy [her] burden of proof must be competent and admissible at trial.").
[76] *See* Dkt. No. 18.

amended complaint, those claims have been dismissed and that portion of the complaint is hereby **STRICKEN**. This said, Defendant contends that Plaintiff's Title VII claim is untimely,[77] and that it fails on the merits.[78] The Court ultimately agrees with both contentions.

### A.     *Plaintiff's Title VII claims are untimely*

Before bringing a Title VII claim, and in order to exhaust administrative relief,[79] a claimant "shall" file a charge of discrimination with the EEOC "within three hundred days after the alleged unlawful employment practice occurred . . . ."[80]  The term "shall" "makes the act of filing a charge within the specified time period mandatory,"[81] creating an "obligation impervious to judicial discretion."[82]  Interestingly, timeliness "is not a jurisdictional prerequisite to suit in federal court," but rather functions "like a statute of limitations . . . ."[83] The clock generally begins ticking when the plaintiff learns of the "discriminatory acts" in question,[84] not when "the consequences of the acts became most painful,"[85] or "on some future date at which the plaintiff discovers that the act may have been motivated by discriminatory animus."[86]

Here, the clock began ticking no later than July 6, 2015—the date Plaintiff was made aware that Wongkasem received the UTRGV Phase II tenured position, and that he did not.[87]

---

[77] Dkt. No. 25 p. 10, ¶ 25.

[78] Dkt. No. 25-1 pp. 12–15.

[79] *See Patton v. Jacobs Eng'g Group, Inc.*, 874 F.3d 437, 443 (5th Cir. 2017); *Lavigne v. Cajun Deep Foundations, L.L.C.*, 654 Fed. Appx. 640, 643 (5th Cir. 2016), cert. denied, 137 S. Ct. 1328 (2017).

[80] 42 U.S.C.A. § 2000e-5(e)(1) (West); *see Griffin v. City of Dallas*, 26 F.3d 610, 612 (5th Cir. 1994) (applying this provision in the Title VII context).

[81] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

[82] *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

[83] *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 521 (5th Cir. 2008) (emphasis added); *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

[84] *Pacheco v. Rice*, 966 F.2d 904, 906 (5th Cir. 1992) (citing *Merrill v. Southern Methodist University*, 806 F.2d 600, 605 (5th Cir.1986) for the proposition that the EEOC-charge clock begins to tick "when a plaintiff knows or reasonably should know that the discriminatory act has occurred, not when he or she first perceives that a discriminatory motive caused the act.").

[85] *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980).

[86] *Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 661, 684 (S.D. Tex. 2007) (citing *Pacheco*, 966 F.2d at 906; *Merrill*, 806 F.2d at 605), aff'd sub nom. *Bradley v. Phillips Chem. Co.*, 337 Fed. Appx. 397 (5th Cir. 2009).

[87] Dkt. No. 25-1 p. 90; *id.* p. 92 (an email setting up the meeting in which Plaintiff was informed he did not get the job).

Three-hundred days after July 6, 2015 was May 1, 2016. Thus, Plaintiff cannot bring the instant Title VII claim unless he filed an EEOC discrimination charge by May 1, 2016. He did not. Instead, he filed an EEOC intake questionnaire nearly two months later, on June 24, 2016.[88] Thus, even assuming the EEOC intake questionnaire constituted an EEOC "charge," Plaintiff's Title VII claim is untimely.

Plaintiff argues that the 300-day clock did not begin ticking until September 1, 2015 because it was not until this date that UTRGV became "operational," and thus, the discriminatory act could not have occurred any earlier.[89] However, this argument fails because it confuses the date Plaintiff was made aware of the alleged discriminatory act (i.e., when Plaintiff was told Wongkasen got the tenured position) and the time at which "the consequences of the acts bec[a]me most painful,"[90] (i.e. the date Plaintiff would have started working for UTRGV as a tenured professor had he gotten the position). The former is legally relevant, while the latter is not.

Plaintiff contends in the alternative that "the doctrines of equitable tolling, equitable estoppel, fraudulent concealment and the discovery rule should apply" because Plaintiff declares he "did not become aware until after September 1, 2015 . . . that the other candidate . . . did not have the qualifications for the job posting and that gender was a consideration."[91] Put differently, Plaintiff did not know until after September 1, 2015 that the adverse employment action against him might have been unlawfully *motivated*. Thus, Plaintiff appears to argue the discovery rule applies to his Title VII claim. Yet, the Supreme Court has "declined to address whether Title VII

---

[88] *See* Dkt. No. 25-1 p. 75.
[89] Dkt. No. 26 p. 8, ¶ 37.
[90] *Ricks*, 449 U.S. at 258.
[91] Dkt. No. 26 p. 9, ¶ 41.

suits are amenable to a discovery rule."[92] However, the Fifth Circuit has expressly rejected the notion that a Title VII discrimination claim—and its attendant pre-suit requirements periods— begins to accrue when the plaintiff learns of discriminatory intent, as opposed to the discriminatory act itself.[93] Furthermore, Plaintiff offers only his conclusory allegation that after September 1, 2015 he learned "that gender was a consideration." Even were the Court to consider the discovery rule, this conclusory allegation fails to raise a genuine issue of material fact on this issue.

Otherwise, Plaintiff provides—*literally*—no argument explaining how or why equitable tolling, equitable estoppel or fraudulent concealment apply. While equitable tolling may, in some instances, toll an otherwise time-barred claim, Plaintiff fails to present evidence to support the claim. The Fifth Circuit has noted that "[e]quitable tolling is to be applied 'sparingly.'"[94] The Fifth Circuit has also recognized that a "Plaintiff's unawareness of facts giving rise to the claim because of the Defendant's intentional concealment of them" may warrant equitable tolling.[95] Here, Plaintiff does not supply evidence that Defendant committed any wrongdoing or concealed any relevant facts. Rather, the evidence establishes that Plaintiff was told, in July 2015 that Wongkasen had been hired.[96] Plaintiff does not rebut this.

Even if Plaintiff did not actually learn until September 1, 2015 that Wongkasen's gender was a consideration, he had eight months thereafter to timely file his EEOC charge. Even if Plaintiff himself was unfamiliar with the filing requirements of Title VII, he was represented by counsel as of August 31, 2015 and was actually suing UTRGV for its failure to hire him. It is

---

[92] *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 642 (2007) (internal citations omitted), overturned on other grounds due to legislative action (Jan. 29, 2009); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 124 (2002).
[93] *Pacheco*, 966 F.2d at 906; *Merrill*, 806 F.2d at 605.
[94] *Granger v. Aaron's, Inc.*, 636 F.3d 708, 712 (5th Cir. 2011).
[95] *Id*.
[96] Dkt. No. 25-1, Exhibit 10.

well established that "[o]ne who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence."[97] Finally, Plaintiff offers no evidence for finding that equitable estoppel or fraudulent concealment should save his claim. Thus, Plaintiff's equitable tolling, equitable estoppel, fraudulent concealment, and discovery rule contentions fail. Ultimately, Plaintiff's Title VII claim is untimely.

B.    *Plaintiff's Title VII claim fails on the merits*

Even considering the Title VII claim on the merits, it fails. Title VII provides: "It shall be an unlawful employment practice for an employer . . . to refuse to hire . . . any individual . . . because of such individual's . . . sex . . ."[98] Plaintiff contends that Defendant violated this provision by hiring a female for the tenured position rather than him.[99] Thus, Plaintiff alleges that Defendant discriminated against him by *failing to hire him on the basis of his sex*.[100]

The manner in which the Court proceeds at this juncture depends upon whether direct evidence exists that Plaintiff was discriminated against on the basis of his sex. Here, Plaintiff has proffered some direct evidence of discrimination, but it is not *cognizable* because it is substantively inadmissible hearsay with no obvious exception. The Fifth Circuit has held that substantively inadmissible hearsay cannot be employed at the summary judgment stage of litigation.[101] The Fifth Circuit has also held that district courts have the power to *sua sponte* reject hearsay evidence at the summary judgment stage, even when, as here, it was not objected to.[102]

---

[97] *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984).
[98] 42 U.S.C.A. § 2000e-2(a) (West).
[99] Dkt. No. 26 p. 5, ¶ 19.
[100] *See id.* ¶ 17.
[101] United States v. $92,203.00 in U.S. Currency, 537 F.3d 504, 508 (5th Cir. 2008) ("[T]he affidavit clearly contained hearsay . . . and, under normal summary judgment procedures, is not admissible.").
[102] *Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012).

Plaintiff stated during his deposition that (1) Dr. Chen ("Chen")—Chair of the Computer Science Department—told Plaintiff that (2) Dean Gonzalez told Chen: "*What can I do? She's a female.*"[103] Plaintiff sets forth this statement specifically to prove that "[Wongkasem] was hired because she was female."[104] *Insofar* as the quoted statement tends to indicate this, it is hearsay.[105] Since the statement is allegedly relayed first from Dean Gonzalez to Dr. Chen, and then from Dr. Chen to Plaintiff, we are dealing with double hearsay, and *both* layers need hearsay exceptions for the statement to be substantively admissible.[106]

There are no obvious hearsay exceptions for both layers here. Even if some sort of exception applies to Dean Gonzalez's alleged statement, there is no such exception for Chen's iteration of the statement to Plaintiff. Chen is not named as an opposing party in this suit and did not ostensibly recall Dean Gonzalez's statement in a representative capacity on behalf of Defendant. Moreover the statement was not an expression of *Chen's* then-existing state of mind (it was simply a rehashing of *Dean Gonzalez's* previous alleged statement). No other exceptions have any potential application. Thus, insofar as Dean Gonzalez's alleged statement "What can I do? She's a female" indicates Wongkasem was hired because she is a female, it constitutes inadmissible hearsay, and will be disregarded for purposes of this motion. Insofar as this statement does *not* mean Wongkasem was hired because she is a female, it is incapable of supporting Plaintiff's Title VII claim.

Because there is no cognizable direct evidence of unlawful discrimination, the *McDonnell Douglas* burden shifting framework governs.[107] Under this framework, the plaintiff

---

[103] Dkt. No. 26-7 p. 13 (emphasis added); *see also* Dkt. No. 26-8 p.14.
[104] *See* Dkt. No. 26 p. 7, ¶ 30 ("[Plaintiff] testified the dean said she was hired because she was female.").
[105] *See* Fed. R. Evid. 803.
[106] *See* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").
[107] *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005).

bears the initial burden to establish a *prima facie* claim of discrimination.[108] In the failure-to-hire

context, a *prima facie* Title VII discrimination claim has the following essential elements: (1) the

claimant is a member of a protected class, (2) is qualified for the position in question, (3) was not

hired for the position, and (4) the position was given to a person outside the claimant's protected

class.[109] Satisfaction of these elements results in a presumption of unlawful discrimination, thus

shifting the burden to the defendant to set forth legitimate, nondiscriminatory reasons for its

decision not to hire the claimant.[110]

If the defendant sets forth legitimate, nondiscriminatory reasons for its decision, then

"any presumption of discrimination raised by the plaintiff's *prima facie* case vanishes,"[111] and

the burden shifts back to the plaintiff to prove that each proffered reason was a mere pretext for

unlawful discrimination. In doing so, a "plaintiff must put forth evidence rebutting *each* of the

nondiscriminatory reasons the employer articulates."[112] To carry this burden, "the plaintiff must

produce substantial evidence of pretext"—effectively by a preponderance of the evidence.[113] The

Fifth Circuit clarifies that "[o]ur job as a reviewing court conducting a pretext analysis is not to

engage in second guessing of an employer's business decisions."[114]

Here, Plaintiff establishes a *prima facie* discrimination claim. Defendant does not dispute

that the first three elements are met. The *first* element—being a member of a protected class—is

satisfied because Plaintiff is a male,[115] and Title VII protects both males and females from sex

---

[108] *Id.*
[109] *See Henderson v. AT & T Corp.*, 933 F. Supp. 1326, 1337 (S.D. Tex. 1996); *see also Brown v. AT & T Services Inc.*, 236 F. Supp. 3d 1000, 1006 (S.D. Tex. 2017); *Chhim v. City of Houston*, 2012 WL 6020296, at *2 (S.D. Tex. Dec. 3, 2012); *Sanders v. Anadarko Petroleum Corp.*, 108 Fed. Appx. 139, 142 (5th Cir. 2004); *Brown v. Outsource Specialist, Inc.*, 273 F.3d 1108 (5th Cir. 2001).
[110] *Septimus*, 399 F.3d at 609.
[111] *Id.*
[112] *Brown*, 236 F. Supp. 3d at 1006 (emphasis added).
[113] *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001).
[114] *Hernandez v. Metro. Transit Auth. of Harris County*, 673 Fed. Appx. 414, 419 (5th Cir. 2016).
[115] Dkt. No. 26 p. 5, ¶ 17; Dkt. No. 26-2 p. 11.

discrimination.[116] The *second* element—being qualified for the position in question—is also satisfied. During Phase I, Plaintiff was offered a tenured faculty position at UTRGV that paid approximately the same as the tenured position at UTRGV he did not receive during Phase II.[117] Moreover, Plaintiff made the final short list out of twenty-three applicants for the Phase II tenured position at UTRGV.[118] Even in Dean Gonzalez's recommendation to Rodríguez that Wongkasem be hired, he noted that Plaintiff "should be considered a well-qualified candidate."[119] The *third* element—not being hired for the position—is satisfied because there is direct evidence that Plaintiff was not hired for the tenured position at UTRGV during its Phase II hiring cycle.[120]

Finally, the *fourth* element—someone outside the claimant's protected class was hired—is satisfied because Wongkasem, a female,[121] was hired instead of Plaintiff, a male. Defendant does not dispute this fact. Instead, Defendant attempts to attack the fourth element by misconstruing the applicable legal standard. In particular, Defendant cites *Earle v. Aramark Corp.*[122] for the proposition that the fourth element is satisfied by proof that "similarly situated employees outside the protected class were treated more favorably under nearly identical circumstances."[123] Defendant then argues that Plaintiff and Wongkasem are not similarly situated.[124] However, plaintiff omits an important *alternative* method of satisfying the fourth element which is specifically listed in *Earle v. Aramark Corp.*—being "replaced by someone

---

[116] *See* 42 U.S.C.A. § 2000e-2(a) (West).
[117] Dkt. No. 25-1 p. 84.
[118] *Id*. 70.
[119] *Id*. p. 67.
[120] Dkt. No. 25-1 p. 92, ¶ 7; Dkt. No. 25-1 p. 90 (an email setting up the meeting in which Plaintiff was informed he did not get the job).
[121] Dkt. No. 25-1 p. 56 (a picture of Wongkasem).
[122] 247 Fed. App'x. 519, 523 (5th Cir. 2007).
[123] Dkt. No. 25 p. 12 (quoting *Earle*, 247 Fed. App'x. at 523).
[124] *Id*. pp. 12–13.

outside [his] protected class . . . ."[125] Satisfaction in this manner in the failure-to-hire context is well-established.[126] Thus, Plaintiff has established a *prima facie* discrimination claim, creating a presumption of unlawful discrimination and shifting the burden to Defendant to set forth legitimate, nondiscriminatory reasons for not hiring Plaintiff.

Defendant carries its burden by setting forth specific evidence that Wongkasem was more qualified than Plaintiff for the job. In particular, Foltz recommended Wongkasem to Dean Gonzalez because Wonkasem "had a far better publication and funding track record in recent years."[127] Foltz noted that Wongkasem published her scholarly articles in "high impact journals in the field, such as the *Journal of Optics*," and also that Wongkasem "had developed new courses in her field."[128] In turn, Dean Gonzalez recommended Wongkasem to Rodríguez because she was distinguished from Plaintiff in "professional achievement" and thus had "a higher potential for long term success."[129] Thus, Wongkasem was the overall "top candidate for the position."[130] There is also substantial evidence, as previously noted, that Plaintiff's research productivity declined substantially for seven years after receiving tenure. Consequently, Defendant has carried its burden and any presumption of discrimination in Plaintiff's favor has vanished. The burden shifts back to Plaintiff to bring forth "substantial" evidence that each of these proffered reasons were pretext for unlawful sex discrimination. He does not carry his final burden.

Plaintiff does *not* contest that since Plaintiff received tenure in 2008, Wongkasem was far superior with regards to the number and prestige of scholarly publications, external research

---

[125] *Earle*, 247 Fed. Appx. at 523.
[126] *See Henderson v. AT & T Corp.*, 933 F. Supp. 1326, 1337 (S.D. Tex. 1996) (the fourth element can be satisfied with proof that "the position was given to a person outside the protected class."); *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005); *Chhim v. City of Houston*, 2012 WL 6020296, at *2 (S.D. Tex. Dec. 3, 2012).
[127] Dkt. No. 25-1 p. 92, ¶ 5.
[128] *Id*.
[129] *Id*. pp. 66–67.
[130] *Id*. p. 67.

funding, and development of new courses in the relevant field. Thus, he fails to rebut "each" proffered legitimate, nondiscriminatory reason for Defendant's decision not to hire Plaintiff. For this reasons alone, Plaintiff fails to carry his burden.

Instead, Plaintiff attempts, in scattershot fashion, to poke holes in Wonkgasem's qualifications and Defendant's motivations in hiring her by inviting the Court to second-guess Defendant's internal business decisions and predicate underlying workings. Plaintiff's attempts to prove pretext fail, even putting aside the fundamental impropriety of this approach. *First*, Plaintiff states that Defendant "needed to hire the female candidate to improve [its] diversity."[131] The only cited evidence to support this is Foltz's statement that when UTRGV was deciding who to hire, the electrical engineering department had one female faculty member, and eight male faculty members.[132] This naked numerical difference, although explaining how there might have been room for more diversity, does not alone support Plaintiff's contention that UTRGV "needed" to improve its diversity. Moreover, the Court cannot help but notice the following (highly relevant) portion of Foltz's deposition that Plaintiff *attempted* to blot out with black marker:

> Q: And so you would agree that it was important to bring in [Wongkasem] in order to increase the female representation within the electrical department for females?
>
> A. I did not view our numbers as a problem at the time, and I still don't.
>
> Q. So you don't view the numbers as being a problem that there are only two female electrical engineering professors in the electrical engineering department at this time, and there are eight male associate professors?
>
> A. No one views it as a . . . problem that needs to be solved, no.[133]

Thus, Plaintiff's own evidence directly and decisively disproves his first pretext argument.

---

[131] Dkt. No. 26 p. 6, ¶ 23.
[132] Dkt. No. 26-3 p. 5.
[133] *Id.*

Plaintiff's *second* argument is that the National Science Foundation's ADVANCE grant somehow motivated UTRGV to hire Wongkasem instead of Plaintiff.[134] Indeed, Foltz notes that this grant is "designed to attract more females to the science and technology fields."[135] Moreover, the ADVANCE grant is also briefly referenced in the EEO statement portion of the Phase II UTRGV job posting.[136]

However, Plaintiff does not point to any evidence that the ADVANCE grant funds at UTRGV's disposal were in any way dependent upon UTRGV hiring Wongkasem, or women generally for that matter. Foltz states that most ADVANCE funds are spent on programs available to both men and women, and also that the ADVANCE grant "did not directly benefit the Electrical Engineering Department or provide any additional motivation to hire [Wongkasem]."[137] Foltz also notes that $11,000.00 in ADVANCE funds were only packaged and awarded to Wongkasem *after* she had been hired.[138] Lastly, although the EEO statement in UTRGV's Phase II job posting does reference the ADVANCE grant, it also explicitly states that UTRGV "strives to hire without regard to . . . sex . . . ."[139] Thus, Plaintiff's second pretext argument fails.

Plaintiff's *third* argument is that Wongkasem was "not qualified" for the job in the first instance, and thus, her qualifications could not be the basis for choosing her over Plaintiff.[140] However, the overwhelming weight of the record indicates the exact opposite. Out of twenty-three candidates, Wongkasem was selected as a final short-list candidate by UTRGV's search

---

[134] Dkt. No. 26 p. 6, ¶ 24.
[135] Dkt No. 25-1 p. 92, ¶ 6.
[136] Dkt. No. 26-3 p. 19.
[137] Dkt. No. 25-1 p. 92, ¶ 6.
[138] *Id*.
[139] Dkt. No. 26-3 p. 19.
[140] Dkt. No. 26 pp. 6–7, ¶¶ 26–31.

committee.[141] Her masters and doctoral academic credentials are *nearly flawless*, having received 4.00 and 3.97 GPAs in electrical engineering respectively from the University of Massachusetts, Lowell.[142] Indeed, Wongkasem graduated *first* in her class when receiving her masters degree, and thus received the "Graduate Dean's Gold Metal."[143] She was also named the "Outstanding Graduate Student" in her doctoral class.[144] Thus, Wongkasem was the posterchild of success in the Electrical Engineering Department at The University of Massachusetts, Lowell.

A brief look at the rest of Wongkasem's curriculum vitae indicates that she was not only ostensibly qualified for the position, but that she was, frankly, an *astonishing* candidate. She served as a lecturer for the University of Khon Kaen, Thailand, while completing her masters degree (in the United States),[145] and thereafter served as a teaching and research assistant at the University of Massachusetts, Lowell, which required her to lecture and supervise students.[146] During her doctoral studies, Wongkasem developed, among other things, a novel approach—"Group theory"—to categorize magnetoelectric materials.[147]

Wongkasem founded and directed MetaSolver Research Laboratory in Tailand,[148] and since 2007 served as an Associate Professor in the Electrical Engineering Department at the University of Khon Kaen, Tailand.[149] During that time, she supervised doctoral and masters theses.[150] Since 2008, Wongkasem authored three textbooks,[151] received eight patents,[152] obtained eight grants, and also enjoyed the publication of eleven peer-reviewed journal pieces

---

[141] Dkt. No. 25-1 p. 70.
[142] *Id*. p. 56.
[143] *Id*. p. 59.
[144] *Id*.
[145] *Id*. p. 58.
[146] *Id*.
[147] Dkt. No. 25-1 p. 58.
[148] *Id*.
[149] *Id*.
[150] *Id*. p. 56.
[151] *Id*. p. 63.
[152] *Id*.

and eighteen conference proceedings, many published by prestigious sources such as the *Journal of Optics*.[153]

In an effort to overcome this tidal wave of evidence, Plaintiff contends that Wongkasem was not qualified because she had never previously worked in the United States,[154] was not previously tenured in the United States or in Thailand (where there is no tenure),[155] and had no external funding record.[156] These arguments fail. The evidence indicates Wongkasem *did* previously work in the United States as an intern, teaching assistant, and research assistant.[157] Moreover, if, as Plaintiff contends, there is no tenure in Thailand, then Wongkasem's failure to obtain (non-existent) tenure in Thailand is meaningless and says nothing about her qualifications, one way or the other.

Furthermore, according to Plaintiff's own testimony, the significance of tenure in the United States is its indication that the person in question has six years of teaching experience and a track record of research activity.[158] Here, Wongkasem *did* teach for more than six years (seven to eight in fact),[159] and also had a vibrant research track record.[160] Thus, her previous lack of tenure in the United States has little import—she had the ostensible characteristics of a tenured professor. Finally, Plaintiff's assertion that Wongkasem had no track record of external funding is directly belied by documentary evidence indicating she had a robust track record of external funding since 2008.[161]

---

[153] Dkt. No. 25-1 pp. 60–63.
[154] Dkt. No. 26 p. 7, ¶ 29.
[155] *Id.* ¶ 27.
[156] *Id.* ¶ 31.
[157] Dkt. No. 25-1 p. 58.
[158] Dkt. No. 26-7 pp. 10–11.
[159] *See* Dkt. No. 25-1 p. 56 (indicating Wongkasem taught as an Associate Professor at Khon Kaen University since 2007).
[160] Dkt. No. 25-1 pp. 57–65.
[161] *Id.* p. 57.

Plaintiff also argues that Wongkasem "had never . . . developed undergraduate and graduate courses in electrical engineering."[162] However, the supporting evidence shows that this statement has either been conditionalized into meaningless oblivion, or is simply false. Foltz testifies that Wongkasem *did* develop "new courses in her field."[163] This was no doubt one of his considerations in determining to recommend her for the job. Wongkasem did not develop new courses *in her capacity as a professor in the United States*.[164] Nevertheless, this does not nullify the fact that she did develop new courses in her field before she became a professor in the United States.

Finally, Plaintiff reintroduces Dean Gonzalez's alleged statement "What can I do? She's a female" and Chen's alleged rehashing of that statement to Plaintiff.[165] As previously noted, insofar as this statement may indicate Wongkasem was hired because she is female, it is inadmissible hearsay. Insofar as it does *not* indicate Wongkasem was hired because she is female, then it does nothing to establish pretext, as Plaintiff must. Thus, Plaintiff's final pretext argument fails.

In sum, Plaintiff's Title VII claim fails on the merits. Although he proves up a *prima facie* discrimination claim, Defendant has provided legitimate, nondiscriminatory explanations for its decision to hire Wongkasem instead of Plaintiff. In particular, Wongkasem was a more qualified applicant with a higher professional trajectory, while Plaintiff's research and external funding productivity had declined rapidly after receiving tenure in 2008. Plaintiff fails to rebut this explanation by (1) failing to rebut the particular facts *underlying* this explanation (that Wongkasen did not in fact publish numerous articles in prestigious journals et cet.), (2) failure to provide substantial evidence of pretext casting meaningful doubt on Defendant's true motives,

---

[162] *Id.* p. 7, ¶ 28.
[163] *Id.* p. 82, ¶ 5.
[164] Dkt. No. 26-6 pp. 5–6.
[165] Dkt. no. 26 pp. 7–8, ¶¶ 32.

and (3) all the while inviting the Court to second guess Defendant's business decisions—something the Fifth Circuit expressly prohibits in pretext analysis.[166] Summary judgment in Defendant's favor is warranted.

### IV.  HOLDING

Plaintiff's Title VII claim against Defendant is untimely and fails on the merits. Thus, Defendant's motion for summary judgment is **GRANTED**, and Plaintiff's Title VII claim is **DISMISSED WITH PREJUDICE**. This being the last remaining claim, and in accordance with Rule 58, a final judgment will be issued separately.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 2nd day of February, 2018.

_____
Micaela Alvarez
United States District Judge

---

[166] *Hernandez v. Metro. Transit Auth. of Harris County*, 673 Fed. Appx. 414, 419 (5th Cir. 2016).